**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JoANN LEE, Individually and as Parent and
Next Friend of Caitlin Paige Lee, a minor

       Plaintiffs,

vs.                                      CIVIL NO. 07-0881 MV/WPL

EDWARD MEDRANO, individually and in his
official capacity as a Deputy Sheriff of Otero County,
JOHN BLANSETT, individually and as Sheriff of
Otero County,

          Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

      This matter is before the Court on Defendant's Motion for Summary Judgment, filed July 14, 2008 [**Doc. No. 28**].  The Court, having considered the motion, briefs, and relevant law and being otherwise fully informed, finds that the motion is well-taken in part and will be **granted** in part.

      In their amended complaint, Plaintiffs, JoAnn Lee, individually and as parent and next friend of Caitlin Paige Lee, a minor, bring claims arising from the arrest of Plaintiff JoAnn Lee on September 9, 2005.  These claims are brought  pursuant to 42 U.S.C. § 1983, the New Mexico Tort Claims Act and New Mexico common law against Deputy Edward Medrano of the Otero County Sheriff's Department in his individual and official capacity and against Sheriff John Blansett of the Otero County Sheriff's Department in his individual and official capacity. *See* Amended Complaint. [**Doc. No. 17**] On August 29, 2008,  in accordance with the parties stipulation filed August 25, 2008, [**Doc. No. 32**] the Court dismissed all claims against Defendant Blansett and all claims for punitive

damages under the New Mexico Tort Claims Act.

## BACKGROUND

The Court has set forth the factual background of this case in accordance with the well-established standards of summary judgment.  The facts addressed here are either uncontroverted or viewed in the light most favorable to Plaintiffs, unless otherwise stated.

Between the dates of March 18, 2005 and March 29, 2005, Plaintiff JoAnn Lee ("Mrs. Lee") traveled to Japan with her husband Richard Lee ("Mr. Lee"), her daughter Caitlin Lee ("Caitlin"), her sister Tina Vasquez ("Tina"), and her niece Christina Vasquez ("Christina").   Caitlin was six years old at the time.  During the trip to Japan, Mrs. Lee learned that Caitlin was being sexually abused by Caitlin's grandfather, Chester Friel ("Mr. Friel").  Mrs. Lee learned of the abuse through her sister Tina. Caitlin had earlier confided the sexual abuse in Tina's daughter, Christina.  Caitlin gave enough information to her cousin that it was evident there had been some type of sexual abuse occurring.  Chester Friel had sexually abused Mrs. Lee as a child.  Mr. Lee was aware that Mrs. Lee had been abused before they were married.   Mrs. Lee learned for the first time during the trip to Japan that their father had also sexually abused Tina.

About a year before disclosing the sexual abuse during the trip to Japan, Caitlin reported to Mrs. Lee that she (Caitlin) had seen her grandfather, Chester Friel, naked.   When Mrs. Lee confronted Mr. Friel, he stated that Caitlin had walked in on him naked while he was getting dressed for church.   In an attempt to verify whether Caitlin had accidentally seen her grandfather naked or if something inappropriate was going on, Mr. and Mrs. Lee decided that Caitlin should see a counselor at school.   After speaking with Caitlin, the counselor informed Mr. and Mrs. Lee that he did not believe anything inappropriate had occurred.  Believing that Caitlin had accidentally seen her grandfather naked, Mr. and Mrs. Lee continued to allow Caitlin to spend time alone with her

2

grandfather. Mr. Friel lived in a mobile home immediately adjacent to the home of Mr. and Mrs. Lee and Caitlin.  Caitlin saw her grandfather on a daily basis and spent time alone with him.  At her grandfather's home Caitlin had her own bedroom where she kept her toys.   In 2002 or 2003, Mr. Friel had come to live next to the Lee's so that Mrs. Lee could help take care of him.  Caitlin was very close to her grandfather.  In 2005, at the time Caitlin reported that she had been sexually abused by her grandfather, he was 77 years old.  Mr. Friel also suffered from heart disease, was recovering from colon cancer and was a diabetic.  Mrs. Lee did not believe that he would harm Caitlin because he was in poor health and had been an alcoholic at the time he abused her, but no longer consumed alcohol.

In Japan, after Caitlin had disclosed that her grandfather had sexually abused her, Mrs. Lee, Mr. Lee and Tina Vasquez decided that they would try to place Mr. Friel in a VA hospital where he could receive psychiatric care.  Mr. Lee stated in his deposition that "it was a family matter [and] [w]e were going to take care of it."  Plaintiffs' Exh. 1 (Richard Lee's Depo) at 17, lines 7-8.

"Immediately" upon returning from Japan on March 30, 2005, Mrs. Lee began making inquiries about placing her father in a VA hospital.  *Id.* at 21, line 17.  Neither Plaintiff JoAnn Lee, nor her husband Richard Lee, contacted Children Youth and Families Department ("CYFD"), Social Services, Health and Human services or law enforcement to report her daughter's allegations of sexual abuse.

Within two days, after the Lee's returned from Japan, Tina Vasquez contacted CYFD and reported Caitlin's allegations of sexual abuse.  On April 1,  Otero County Sheriff's Deputy Ande McFarlane visited the Lees' home to  check on the welfare of Caitlin and schedule a Safehouse interview with her.  On April 2, Mrs. Lee confronted Chester Friel about the sexual abuse. He confirmed the allegations but told her that he would die before going to jail.

3

On April 6, 2005, Defendant Deputy Sheriff Edward Medrano assisted Josie Jaramillo, a forensic interviewer, in the Safehouse interview of Caitlin. Victims' Advocate Dawn Van Arnam and CYFD Social Worker Angie Baker were also present during the interview. During the interview, Caitlin detailed the sexual contact between Mr. Friel and herself. She also stated that she had told her mother, Mrs. Lee, about the abuse and that they had discussed the abuse during the trip to Japan. Caitlin further stated that her mother told her that her grandfather "might go to jail and get killed by inmates, because they don't like people like that in jail."[1]

Later in the day on April 6, 2005, Defendant Edward Medrano met with Mrs. Lee and discussed the Safehouse interview. The following day, Defendant Medrano obtained a search warrant for Mr. Friel's residence. The search yielded items which confirmed Caitlin's account of sexual abuse. Pursuant to an arrest warrant, Mr. Friel was subsequently arrested on May 5, 2005 at Peak Psychiatric Hospital where he was due to be discharged. Mr. Friel had been treated as a residential patient at several psychiatric hospitals following an apparent suicide attempt on April 6, 2005.

Prior to Chester Friel's arrest, Plaintiff JoAnn Lee told law enforcement personnel and social workers that she did not want Caitlin to testify in Chester Friel's trial. Indeed during the course of the investigation, Mrs. Lee stated to them that she "would do what [she] had to do to make sure she [Caitlin] didn't testify." Plaintiffs' Exh. 2 (JoAnn Lee Depo) at 65, lines 15-16. By her own

_____

[1]Mrs. Lee testified in her deposition that she did not make this statement directly to Caitlin but that instead Caitlin may have overheard her parents discussing the matter. However, it is uncontroverted that Caitlin made this statement to Defendant Medrano. Caitlin's father testified in his deposition that he told Caitlin that her grandfather's life might be in danger if he went to jail. During Mr. Lee's deposition, the following exchange took place: Q. Did you ever discuss with her (Caitlin) the possibility that given his age and the charges against him (grandfather), that he could be harmed in jail or die in jail? A. Oh, Yes. Oh, yeah. As a matter of fact that's what I told her happens to child molesters in jail. Q: You told that to your daughter? A. Yeah. I mean, that's a fact of life, and I don't hide things from my daughter, you know. Plaintiffs' Exh. 1 (Mr. Lee's Depo) at 44, lines 2-11.

admission, Mrs. Lee was "very adamant" that Caitlin would not have to testify. *Id.* at 66, line 13. She insisted that the Safehouse interview was sufficient for Chester Friel's trial. She also stated to law enforcement personnel and social workers that she did not believe that Chester Friel should be prosecuted for sexual abuse of Caitlin and that instead he should be committed to a mental health facility.

On September 6, 2005, Defendant Medrano met with victims' advocate Dawn Van Arnam. Van Arnam reported that she had learned from Mrs. Lee that she was very upset at the fact that the District Attorneys Office was going forward with the prosecution of Mr. Friel and that she would take whatever steps were necessary to prevent Caitlin from testifying at trial against her grandfather. Van Arnam further learned that Mrs. Lee was thinking of taking her daughter out of the State of New Mexico to keep her from testifying. According to Van Arnam, Mrs. Lee stated that rather than having Mr. Friel prosecuted, she wanted Mr. Friel committed to a hospital. Mrs. Lee further informed Van Arnam that her daughter was very upset over the whole matter and felt that it was her fault that her grandfather was in jail. Mrs. Lee additionally stated that she was permitting Caitlin to talk to Mr. Friel when he called the Lee residence from jail. Mrs. Lee testified in her deposition that although she was "very adamant" that her daughter was not going to testify at trial, *id.* at 66, lines 13-14, she never told anyone that she was thinking of taking Caitlin out of the state. She further testified that although she permitted her daughter to speak on the phone with her grandfather, she did not permit her to discuss the case with him. Mrs. Lee however, does not dispute that Defendant Medrano received this information from Van Arnam. *See* Plaintiff's Response at 9.

After speaking to Van Arnam, Defendant Medrano went to the Office of the Deputy District Attorney ("DDA") Roxanne Esquibel and advised her of the conversation with Van Arnam. DDA Esquibel advised Defendant Medrano to conduct a follow up investigation, including an interview

with Caitlin.

On September 6, Josie Jaramillo accompanied Defendant Medrano to Yucca Elementary School in Alamogordo.  After making arrangements with the school principal, Mrs. Jaramillo interviewed Caitlin in the presence of Defendant Medrano.[2]   During that interview, Caitlin confirmed that she had phone conversations with Mr. Friel while he was in jail and that she had asked him if anybody had attempted to hurt him while he was in jail.  Caitlin stated that she felt "real bad" because she wanted Mr. Friel at home and she felt that he was her friend.  She stated that she would rather see him in a mental hospital than in jail. Caitlin also stated that she was aware of the impending trial and that her mother had told her that she might have to testify at trial, and if she did have to testify it would be better if she got up on the stand and said that she did not remember anything.[3]  Caitlin stated that she was confused because she wanted to tell the truth, but she knew what would happen if she told the truth.  Caitlin stated that her mother told her that if anybody found out what her grandfather had done to her, someone could try to kill him.

On September 7 or September 8, 2005, DDA Roxanne Esquibel and Defendant Medrano met with Mrs. Lee at Esquibel's office.   Although the exact content of the conversation is unclear, the undisputed evidence establishes that DDA Esquibel and Defendant Medrano discussed with Mrs. Lee what they had learned from Caitlin and warned Mrs. Lee about her conduct.  Mrs. Lee testified in her deposition that she was told they had "enough to arrest [her]."  Plaintiffs' Exh.2 (JoAnn Lee's Depo) at 78, lines 14-15.  According to Mrs. Lee, she responded "well, if you're going to arrest me, arrest me now, or I'm out of here."  By Mrs. Lee's own admission, she "blew up" during the course

---

[2]New Mexico law permits a law enforcement agency to interview a child with respect to a report of abuse without the permission of the child's parent or guardian.  *See* NMSA Section 32A-4-5(C) .

[3]While Plaintiff JoAnn Lee disputes that she ever told Caitlin that she should say that she did not remember anything, it is undisputed that Defendant Medrano received this information from Caitlin.

of the conversation. *Id.* at 59, lines 8-9.  Although Mrs. Lee provided conflicting testimony as to whether or not she spoke with Defendant Medrano and DDA Esquibel about Caitlin not testifying, it is clear that she did tell them that they were not to talk to Caitlin again without their (Mr. and Mrs Lee's) knowledge so they could get Caitlin any help she needed.[4]  Plaintiffs' Exh. 4 (JoAnn Lee's affidavit) ¶ 30; Plaintiffs' Exh. 3 (JoAnn Lee's Depo) at 76, lines 6-7.   As Mrs. Lee left the room, she "was so mad [she] slammed the door and it got stuck in the wall." *Id.*  at 77, lines 18-19.   In fact, later that night she told her husband during a telephone conversation that she thought they "might get [her] for destruction of their property." *Id.* at 77, lines 20-21.

On September 9, 2005, Defendant Medrano learned from victims' advocate Dawn Van Arnam that she had been contacted by a CYFD worker who was investigating a new 1-800 sky report of Jane Doe [Caitlin] being in danger at her residence.  Van Arnam stated that she had contacted the school and learned that Caitlin had not been at school for the past two days.

Defendant Medrano informed DDA Roxanne Esquibel that Mrs. Lee had removed Caitlin from school for two consecutive days after learning that Caitlin had been interviewed at school and that Caitlin's absences were unexcused.[5]   At that time, DDA Esquibel believed that probable cause existed to arrest Mrs. Lee for child abuse and obstruction and/or failure to report child abuse.

DDA Esquibel stated in her affidavit that she believed probable cause existed based on the following: a) JoAnn Lee failed to report to law enforcement that Caitlin had reported to her that she

---

[4]In response to counsel's question as to whether during her interview with Defendant Medrano and DDA Esquibel she expressed any hesitation in allowing Caitlin to testify against her father, Mrs. Lee responded: "Every time I talked to anybody, I've told them I did not want . . . Caitlin to have to go in front of a jury . . ." Plaintiffs' Exh. 3 (JoAnn Lee's Depo) at 59, lines 15-21.  Later in her deposition, Mrs. Lee stated that she did not "believe [she] said anything about her (Caitlin) testifying" at the meeting with Defendant Medrano and DDA Esquibel.  *Id.* at 76, lines 4-9.

[5]NMSA Section 22-12-2 requires compulsory school attendance unless a student is absent for medical reasons.

had been molested by Chester Friel; b) JoAnn Lee failed to protect Caitlin from Chester Friel despite the fact that JoAnn Lee and JoAnn's sister had been sexually abused by Chester Friel when they were children; c) JoAnn Lee continued to fail to protect her daughter by allowing Chester Friel, a man she knew was a child molester, have unsupervised access to Caitlin at his residence after Caitlin disclosed that she was being molested by Chester Friel; d) JoAnn Lee allowed Caitlin to talk on the telephone with her molester after he had been arrested on charges of unlawful criminal sexual contact with Caitlin; e) JoAnn Lee advised Caitlin that if she was required to testify against Chester Friel that she should testify that she could not remember the molestation; and f) Caitlin was at risk of being molested again by Chester Friel if her mother made her unavailable at trial by removing her from the jurisdiction or instructing her not to remember the events of her molestation at the hands of Chester Friel.  Defendant's undisputed material fact # 20. *See* Defendant's Exhibit I, ¶ para 9.   Plaintiffs dispute that the facts set forth in a-f provided probable cause to arrest Mrs. Lee for child abuse and obstruction and/or failure to report child abuse.  Mrs. Lee specifically disputes that she ever advised Caitlin to not remember what had occurred.  Plaintiff's Response at 10.  She also specifically disputes that the  Lees permitted Mr. Friel to have any access to their daughter at any time after they learned of Caitlin's allegations of sexual abuse during their trip to Japan.  The Court notes that in Defendant Medrano's affidavit, he included a different basis to support probable cause for the child abuse charge, namely the fact that about a year before the Japan trip, Caitlin had reported that she had viewed her grandfather naked, and Ms. Lee had failed to take action to protect Caitlin, even though she knew she herself had been sexually molested by her father as a child.  *See* Affidavit for Arrest Warrant, ¶¶ 22-26.

While Plaintiffs dispute that probable cause existed and that some of the facts relied upon where not true, they do not dispute that DDA Esquibel's belief that probable cause existed was

sincerely held. *See* Plaintiff's Response at 10.

Richard Lee testified in his deposition that during a conversation with Defendant Medrano in the morning on Friday, September 9, 2005,  he told Medrano to direct any questions he might have to his attorney and that he (Lee) had been instructed not to waste his time talking to him. *See* Plaintiffs' Exh. 1 (Richard Lee's Depo) at 31, lines 11-13.  According to Lee, Defendant Medrano stated "Well, you'll regret this decision."  *Id*. at 31, lines 12-13.

The arrest warrant was approved by District Attorney Scott Key at 6:30 p.m. on Friday, September 9, 2005, and at 7:05 p.m. it was reviewed and signed by District Court Judge Ritter.  At approximately 8:20 p.m. Defendant Medrano served Plaintiff JoAnn Lee with a warrant for her arrest at her residence.    According to Mr. Lee at least four sheriff cars and one state police car pulled up at the house. A woman employed by CYFD was on hand but was not permitted to enter the property because the environment had been declared "hostile" in light of knowledge that Mr. Lee maintained various firearms at his home. Most of the police officers wore bullet proof vests. The officers did not draw their guns or point them at any of the family members at any time during the course of Mrs. Lee's arrest. Mr. Lee and Caitlin were present in the home at the time of Mrs. Lee's arrest and they witnessed the arrest. Mrs. Lee was not treated roughly or physically harmed in any way during or subsequent to her arrest. Caitlin was removed from the home, taken into the custody of CYFD and placed in foster care.   After spending approximately two hours in custody, Mrs. Lee was released on bond and returned home.  Caitlin remained in foster care until Tuesday, September 13, 2005, when she was released back to the custody of her parents.

On September 19, 2005, the charges against Mrs. Lee were dismissed pursuant to a plea and disposition agreement in *State v.Chester Friel*, the case against Ms. Lee's  father.  Mr. Friel pled no contest to two counts of criminal sexual contact of a minor.  In exchange for Mr. Friel's plea of no

contest, the criminal charges in *State v. Joanne Lee*, were dismissed.  The plea and disposition agreement was reviewed and signed by Mr. Friel's attorney, Gary Mitchell, who is also Plaintiffs' counsel in this case.    Mrs. Lee stated in her affidavit that she "never requested, nor did [she] participate in the plea negotiations [her] father entered into [and that] [she] was prepared to go to trial . . . as [she] was innocent.  Plaintiffs' Exh. 4 (JoAnn Lees' Affidavit) ¶ 46.

In a letter dated November 28, 2005, addressed to JoAnn Lee,  CYFD informed her that it had completed its investigation in response to the report of alleged abuse and/or neglect and concluded that allegations of "sexual abuse (sexual molestation)" of Caitlin Lee by Chester Friel were "substantiated" and that allegations of "physical neglect (other neglect) of Caitlin Lee by JoAnn Lee and Richard Lee" were "unsubstantiated."  Plaintiffs' Exh. 4.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*    Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).

Once the moving party meets its burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs.,Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citations omitted). The non-moving party's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield v. Byron*, 436 F.3d 551, 557(5th Cir. 2006) (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F,.3d 854, 860 (5th Cir. 2004). Rather, the non-moving party is required to "go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).

The Court "must view the facts in the light most favorable to the nonmov[ing party] and allow the nonmov[ing party] the benefit of all reasonable inferences to be drawn from the evidence." *Kaus*, 985 F. Supp at 1281. The ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

### I. Section 1983 Claim Based on a Violation of the First Amendment

In Count I of the Amended Complaint, Plaintiffs allege that Mrs. Lee's First Amendment rights were violated when Plaintiff JoAnn Lee was arrested and her daughter removed from the home in retaliation for Mrs. Lee expressing her concern regarding the re-victimization of her daughter if Caitlin were to testify at trial against her grandfather who was accused of sexually molesting her. Plaintiffs contend that "Deputy Medrano's actions were an effort to silence Plaintiff

11

JoAnn Lee's speech on matters of public importance." Amended Complaint at 6, ¶ 35. [6]

Defendant moves for summary judgment on the basis that Mrs. Lee has failed to demonstrate a violation of her First Amendment right.  Defendant maintains that JoAnn Lee's speech is not protected speech as it does not relate to a "matter of public concern," Defendant's Motion at 11, and "instead constitutes criminal behavior under New Mexico law."  *Id.* at 10.  Defendant states that Mrs. Lee "was arrested because she engaged in conduct which violated New Mexico law and that probable cause existed for her arrest." *Id.* at 12.  To further support his position, Defendant points out that "Deputy District Attorney Esquibel determined that . . . probable cause existed for the arrest" and that "the arrest warrant was reviewed by an additional prosecutor and approved by the Court." *Id.* at 14.

Mrs. Lee responds that her statements regarding her wishes not to have her daughter further traumatized by having to testify at trial, constitute protected speech.  She maintains that such speech is protected because it involves matters of public concern, as evidenced by various New Mexico laws and a Supreme Court rule demonstrating the need to protect victims and specifically victims of sexual abuse who are minors.   Mrs. Lee denies that she engaged in any criminal conduct and asserts that it was her statements regarding her wishes that her daughter not "be further traumatized by having to testify" at trial that "precipitated [her] arrest."   Plaintiff's Response at 14.

The Court notes at the outset that the parties have analyzed Mrs. Lee's First Amendment retaliation claim under an incorrect standard.  In the context of this case, there is no requirement that the speech address a matter of public concern in order to constitute protected speech.

Mrs. Lee brings her claim as a private citizen.  She does not bring it as a government

---

[6]The Court notes that Plaintiff Caitlin Lee may not assert any First Amendment violation in light of the fact that the First Amendment challenge is based on the alleged unconstitutional infringement of Plaintiff JoAnn Lee's speech and not Caitlin's speech.

employee.  In *Van Deelen v. Johnson*, 497 F.3d 1151, 1159 (10th Cir. 2007), the Tenth Circuit unequivocally held that "the public concern test enjoys no place in the analysis of a private citizen's First Amendment claims."   The Court characterized the public concern test as one that "was meant to form a sphere of protected activity for public employees, not a constraining noose around the speech of private citizens."   The Court reasoned that " to apply the public concern test outside the public employment setting would require us to rend it from its animating rationale and original context," *id.* at 1156-67, namely "the government's need to maintain an efficient workplace in aid of the public's business."  *Id.* at 1156.

Section 1983 provides a federal civil cause of action against state officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Here, Mrs. Lee claims that her First Amendment right to free speech was violated when Defendant Medrano arrested her and removed her daughter from the home, in retaliation for her statements regarding her wishes that her daughter not testify at Chester Friel's trial.

To make out a claim of retaliation in violation of the First Amendment where, as here, the governmental defendant is not the plaintiff's employer nor a party to a contract with the plaintiff, the plaintiff must establish: (1) that she was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir.2000).

In order to make out her First Amendment retaliation claim, Mrs. Lee must establish all three elements as set forth above.   The Court finds that when viewing the evidence in the light most favorable to Mrs. Lee,  no rational jury could conclude that her arrest was "substantially motivated

13

as a response to the exercise of her constitutionally protected conduct." *Id.*[7]

The Tenth Circuit has held that in order to show that a defendant's adverse action was substantially motivated as a response to a plaintiff's exercise of constitutionally protected conduct, Plaintiff must show that "as a practical matter there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for the hostility or punitive animus towards the claimant because he exercised his specific legal rights. *Gehl Group v. Koby*, 63 F.3d at 1534, n.6 (10th Cir. 1995) (overruled on a different issue), *quoting United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991).

In *DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990), the Tenth Circuit held that there was sufficient evidence upon which a reasonable jury could conclude that the arrest of the plaintiff was substantially motivated by the plaintiff's constitutionally protected conduct in hiring a lawyer when she became a suspect in the death of an eighteen month-old boy who had been in her care close in time to his death. *See id.* at 620.     The Tenth Circuit pointed to evidence in the record that indicated that Bevers, the investigating detective in the case, "worked to cause DeLoach's arrest and prosecution at least partly in retaliation for DeLoach's decision to hire an attorney." *Id.* The Court's determination rested on the following factors: testimony of DeLoach's husband that after his wife hired an attorney, Bevers, expressed displeasure, saying "Well that's not being very cooperative," and thereafter appeared unhappy with DeLoach; testimony of a retired police officer who stated that when he called on the night of DeLoach's arrest to ask if Bevers would allow DeLoach to surrender

---

[7]In light of the fact that the parties applied the wrong legal standard in determining whether Mrs. Lee engaged in constitutionally protected speech and in light of the fact that a determination as to whether Mrs. Lee engaged in constitutionally protected speech is not necessary to a determination of Defendant's motion for summary judgment on Mrs. Lee's First Amendment retaliation claim, the Court shall assume without deciding that her speech was protected.  With respect to the second element, it is well-established that an arrest of an individual constitutes an "injury that would chill a person of ordinary firmness from continuing to engage in [the protected] activity." *Id.*

herself to authorities, Bevers replied, "Payback is hell, that's what she got for hiring a smart-ass lawyer;" the only evidence on the record supporting any failure to cooperate as alleged by Bevers was DeLoach's attorney's request that the second Bevers interview of DeLoach be conducted at the DeLoach home rather than at the police station. *Id.*

Bevers unsuccessfully argued that she could not be held responsible for DeLoach's arrest and prosecution because there were many intervening actors making independent determinations to arrest and prosecute, including the district attorney's office, the magistrate issuing the arrest warrant, and the judge at the preliminary hearing. *Id.* at 621-623. The Tenth Circuit rejected this argument finding that there was evidence from which the jury could believe that Bevers manipulated the process by mischaracterizing the evidence, and by concealing the exculpatory opinion of a medical expert. According to the testimony of the prosecuting district attorney, it was after consulting with this medical expert shortly before trial that convinced the district attorneys office to dismiss the charges against DeLoach. The district attorney also testified that if he had known of the expert's opinion prior to DeLoach's arrest, she would not have been arrested. *Id.* at 621.

Here, by contrast, Mrs. Lee has failed to establish that her arrest was substantially motivated by her exercise of free speech. There is no competent evidence that Defendant Medrano manipulated the process by knowingly making false statements in his affidavit or omitting exculpatory evidence. In addition, two district attorneys and a district judge determined that probable cause existed to support the warrant for Mrs. Lee's arrest. The existence of probable cause and the intervening actions of three other individuals, including a neutral and detached district judge, serve to interrupt any causal nexus between Mrs. Lee's engagement in constitutionally protected speech and her arrest by Defendant. Thus, although Mr. Lee testified in his deposition that Defendant Medrano stated on the morning before Mrs. Lee's arrest that he [Mr. Lee] would "regret

15

his decision" not to talk to him about the case and the Court accepts this statement as true, it is not sufficient alone  to establish a causal nexus between Defendant Medrano's arrest of Mrs. Lee and the exercise of her right to free speech.

Clearly there was probable cause to believe that Mrs. Lee engaged in criminal conduct. Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Guerrero-Hernandez*, 95 F.3d 983, 986 (10th Cir. 1996).  Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Wright*, 16 F.3d 1429, 1438 (6th Cir. 1994) (quoting *Illinois v. Gates*, *infra*).  In the probable cause determination, [courts] look[ ] at the totality of the circumstances of each particular case. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The Court believes that the facts and circumstances available to Defendant Medrano at the time he requested the arrest warrant were based on reasonably trustworthy information that would have led a reasonable person to believe that Mrs. Lee had committed the offenses of Child Abuse and/or Obstruction of Reporting or Investigating of Child Abuse, in violation of NMSA (1978) §30-6-1(D)(1) and §30-6-4(B) respectively.

A person is guilty of child abuse if she ""knowingly, intentionally or <u>negligently</u>, and without justifiable cause, caus[es] or permit[s] a child to be placed in a situation that may endanger the child's life or health."(Emphasis added) NMSA (1978) §30-6-1(D)(1).   As a matter of law, no reasonable juror could conclude that Defendant Medrano did not have probable cause to arrest Mrs. Lee for child abuse.  Mrs. Lee herself admitted to Defendant Medrano that she had been sexually abused as a child and until she left home at the age of 17. *See* Affidavit for Arrest Warrant, ¶ 22.

Defendant Medrano also learned from Mrs. Lee that when Caitlin was five years old, she had seen her grandfather in the nude and that she had seen his penis. *Id.* ¶ 23.  In addition, Mrs. Lee informed him that when she confronted her father, he told her that Caitlin had accidentally walked in on him while he was getting dressed in his bedroom and another time when he was getting dressed in the bathroom. *Id.* ¶ 24.  Mrs. Lee also informed Defendant Medrano that she told her father that Caitlin would be allowed to go to his house by herself, but from that day on, he was to close the door to the bathroom and to his bedroom anytime that Caitlin was in his house.  *Id.* ¶ 25.  Mrs. Lee attempts to defend her actions in permitting her daughter to continue to spend time alone with her grandfather. She attempts to create a genuine issue of material fact by pointing to the fact that Caitlin was subsequently seen by a counselor at school to determine whether Caitlin's viewing of her grandfather was an accident, and that the counselor concluded that "he did not believe anything had occurred." Plaintiffs' Exh. 1 (Mr. Lee's Depo at 12, lines 10-16).  She also maintains that she did not believe her father would sexually abuse Caitlin because he was in poor health and, at the time he had sexually abused her as a child, he was an alcoholic.   However,  these facts and Mrs. Lee's belief that her father would not sexually abuse her daughter, do not raise a genuine issue of material fact because the New Mexico child abuse statute criminalizes not just knowing and intentional conduct but also <u>negligent</u> conduct.   Her lack of knowledge as to the abuse is not a defense to the charge.   The facts available to Defendant Medrano clearly were sufficient to "warrant a [person] of reasonable caution in the belief" that Mrs. Lee had violated the New Mexico child abuse statute by continuing to permit Caitlin to spend time alone with her grandfather knowing that she (Mrs. Lee) had been sexually abused by him as a child and knowing that Caitlin had reported seeing her grandfather naked.  *Carroll v. United States*, 267 U.S. 132, 162 (1925).

Likewise, Defendant Medrano had probable cause to believe that Mrs. Lee had violated

17

NMSA (1978) § 30-6-4(B) (Obstruction of Reporting or Investigation of Child Abuse or Neglect), (hereinafter "Obstruction") which criminalizes: "knowingly obstructing, delaying, interfering with or denying access to a law enforcement officer or child protective services social worker in the investigation of a report of child abuse or sexual abuse."

Mrs. Lee attempts to create a genuine issue of material fact by pointing to her deposition testimony where she stated that she did not directly tell Caitlin that if her grandfather went "to jail he would be killed because they don't like people like that in jail." *See* Exh. B, Relevant Portions of Mrs. Lee's Depo at 70, lines 2-12.   Even if Mrs. Lee did not make this statement directly to Caitlin, Mrs. Lee does not dispute that Defendant Medrano received this information from Caitlin, who in spite of her young age had proven to be a reliable and trustworthy source.   She also attempts to create a genuine issue of material fact  through her testimony that she did not tell anyone that she would take Caitlin out of the state to avoid testifying at Mr. Friel's trial.   However, Mrs. Lee does not dispute that Defendant Medrano received this information from Van Arnam.    Likewise, although Mrs. Lee disputes that she told Caitlin to say that she didn't remember if she had to testify against her grandfather, she should say that she didn't remember, she does not dispute that Defendant Medrano received this information from Caitlin.   Finally, Mrs. Lee attempts to create a genuine issue of material fact by pointing to her testimony that she took her daughter out of school, not to interfere with the investigation but to care for Caitlin because she had been teased by other students in her class about being a "jailbird" after she returned from her interview.   Assuming this information to be true, it is not material to the determination as to whether Defendant Medrano had probable cause to arrest Mrs. Lee for Obstruction.  Mrs. Lee has presented no evidence to raise a reasonable inference that Defendant Medrano knew that this was the reason for Caitlin's unexcused absences from school.

18

Here, there was an abundance of reliable and trustworthy information available to Defendant Medrano that provided probable cause to believe that Mrs. Lee had knowingly interfered or obstructed the investigation of very serious child abuse allegations against Mrs. Lee's father.  The following factors are particularly relevant:  Defendant Medrano learned from Van Arnam that Mrs. Lee was very upset that the district attorneys office was prosecuting her father and that she would take whatever steps were necessary to prevent Caitlin from testifying at her father's trial; Defendant Medrano also learned from Van Arnam that Mrs. Lee was thinking of taking Caitlin out of the state to keep her from testifying; Defendant Medrano  learned from Van Arnam that Mrs. Lee was permitting Caitlin to speak on the phone with her grandfather who was in jail; Caitlin confirmed to Defendant Medrano that she had talked to her grandfather on the phone; Caitlin also told Defendant Medrano that her mother told her that if she had to testify she should say that she didn't remember; Caitlin informed Defendant Medrano that she was confused because she wanted to tell the truth but she knew what would happen to her grandfather if she did; when Defendant Medrano and DDA Esquibel confronted Mrs. Lee with the information Defendant Medrano had received from Van Arnam and Caitlin, and told her that they had enough to arrest her, she became enraged and told them that they were not to talk to Caitlin again without her or Mr. Lee's knowledge; one or two days after speaking with Mrs. Lee, Defendant Medrano learned that Caitlin had been absent from school for two days.  The Court finds that as a matter of law, Defendant had probable cause to believe that Mrs. Lee  knowingly interfered or obstructed the investigation of very serious child abuse allegations against her father.

It is unclear whether the Tenth Circuit requires that a Plaintiff in a retaliatory <u>arrest</u> case must plead and prove the additional essential element of no-probable cause, an element that the Supreme Court has held is required in the context of retaliatory <u>prosecution</u> cases.  *See Hartman v.*

*Moore,* 547 U.S. 250 (2006) (abrogating *Poole v. County of Otero*, 271 F.3d 955 (10th Cir. 2001).

If it is a required element in the context of a retaliatory arrest case, then Mrs. Lee's First

Amendment claim fails on that basis alone.[8]   However, even assuming that the no-probable cause

element is not required, the existence of probable cause in this case, together with the intervening

acts of two district attorneys and a district judge prove fatal to Mrs. Lee's claim. Such factors

prevent her from establishing the requisite causal nexus between the constitutionally protected

speech and the adverse action.

Having determined that Mrs. Lee has failed to establish a violation of her First Amendment

right to free speech, the Court  grants Defendant's motion for summary judgement on Count I of the

Amended Complaint and dismisses the § 1983 First Amendment  claim.

## II. Fourteenth Amendment Due Process Claim Pursuant to 42 U.S.C. § 1983

In Count II of the Amended Complaint, Plaintiffs assert a violation of substantive and

procedural due process on the basis of Plaintiff Lee's arrest in her home.   Plaintiffs' claim rests on

the following grounds: (1) Plaintiff JoAnn Lee was arrested at home, handcuffed and taken to jail

where she was required to be incarcerated in the same facility as her father; (2) Plaintiff JoAnn Lee

is an individual with no prior felony criminal history and would normally be summoned into court,

not arrested; (3) a charged individual is not subject to an arrest the day following an incident in

which a law enforcement agent himself witnesses a felony; (4) Plaintiff JoAnn Lee was charged with

crimes due to her exercise of her First Amendment rights and in an effort to force her to comply with

Defendant Medrano's demands on how he wished to proceed with the prosecution of her father; and

---

[8]It appears that the *Hartman* holding would naturally extend to a retaliatory arrest case particularly where the arrest is effectuated pursuant to a warrant rather than a spur-of-the moment, warrantless arrest.  However, it is not necessary to decide the issue at this time. *See Titus v. Ahlm*, 297 Fed. Appx. 796 (10th Cir. 2008) (unpublished) (declining to decide whether *Hartman*  rule extends to retaliatory arrest cases because Plaintiff had not demonstrated that officer's conduct was substantially motivated by Plaintiff's prior protected speech).

(5) Defendant Medrano's actions were the proximate cause of the violation of Plaintiff JoAnn Lee's substantive and procedural Due Process rights.[9] Amended Complaint,¶¶ 43-47.

### (i) Procedural Due Process

The Due Process Clause of the Fourteenth Amendment prohibits the States from depriving an individual of "life, liberty, or property" without "due process of law." U.S. Const. amend. XIV.

When determining whether the government has deprived an individual of his due process rights, the court engages in a two-pronged inquiry. First, it asks whether the individual possessed a protected interest giving rise to due process protection. If that question is answered affirmatively, then it proceeds to the second inquiry: whether the government afforded the individual an appropriate level of process. *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir.1994); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ("[O]nce it is determined that the Due Process Clause applies, the question remains what process is due.") (*quoting Morrissey v. Brewer*, 408 U.S. 471 (1972); *Federal Lands Legal Consortium v. United States*, 195 F.3d 1190, 1195 (10th Cir.1999) (due process "requires an individual to prove that he or she was deprived of a protected interest and that the deprivation occurred without the 'appropriate' level of process").

While Mrs. Lee has undoubtedly articulated a sufficient liberty interest as to invoke the protection of due process, the liberty interest she has identified is adequately protected by the Fourth Amendment.  The Fourth Amendment provides that: "[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S.

---

[9]The Court notes that nowhere within Count II of the Amended Complaint does Mrs. Lee allege that the removal of Caitlin from the home constituted a violation of Plaintiffs' substantive or procedural due process rights.

Const. Amend. IV.

As the U.S. Supreme Court recognized in *Albright v. Oliver*, 510 U.S. 266 (1994), "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." While Mrs. Lee did not assert a § 1983 Fourth Amendment claim, the protections of the Fourth Amendment furnish Mrs. Lee with all of the process she was constitutionally due.

Mrs. Lee's assertions that: (1) she "was arrested at home, handcuffed and taken to jail [and] required to be incarcerated in the same facility as her father," Amended Complaint, ¶43; (2) that she has "no prior felony criminal history and would normally be summoned into court, not arrested" *id.*, ¶44; and (3) that "a charged individual is not subject to an arrest the day following an incident in which a law enforcement agent himself witnesses a felony," *id.*, ¶45, are insufficient to invoke a cognizable liberty interest beyond the scope of Fourth Amendment protections.

### (ii) Substantive Due Process

The Tenth Circuit recognizes a § 1983 claim for a violation of Fourteenth Amendment substantive due process rights in the narrowest of circumstances. *Becker v. Kroll, 494 F.3d 904 (10th Cir. 2007).* The conduct alleged "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power ... [It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Livsey v. Salt Lake County*, 275 F.3d 952, 957-58 (10th Cir.2001); *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir.1995). This standard is met in only the most extreme circumstances, typically involving some violation of physical liberty or personal physical integrity. *See, e.g., Holland v. Harrington*, 268 F.3d 1179 (10th Cir.2001) (finding substantive due process violation when police held children at gunpoint for extensive period of time even after control of home had been secured); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir.2003) (recognizing

potential parental claim for substantive due process violation where government did not seek consent before performing blood tests and genital exams on minor children).

Even when viewing the evidence in the light most favorable to Mrs. Lee, Defendant Medrano's manner of effectuating Mrs. Lee's arrest at her home and in front of her daughter falls far short of the outrageous and truly conscience shocking conduct required by the Tenth Circuit. Moreover, "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment . . . must be the guide for analyzing these claims. *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (*quoting Graham v. Connor,* 490 U.S. 386, 395 (1989)). Under the facts of this case, Mrs. Lee's liberty interest in being free from unlawful arrest is constitutionally protected by the Fourth and First Amendments. Substantive due process, therefore does not "furnish the constitutional peg on which [she may][] hang" her claim of unlawful arrest. *Id.* at 269 (1994).

For the aforementioned reasons, the Court finds that Defendant Medrano is entitled to summary judgment on Plaintiffs' §1983 Due Process claim and Count II of the Amended Complaint shall be dismissed. Having granted summary judgment on Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction).

### III. Attorneys' Fees and Costs pursuant to 42 U.S.C. § 1988

Section 1988 provides for the award of attorney fees in any action or proceeding to enforce specific federal statutes including §1983. A prevailing defendant is entitled to attorney fees under 42 U.S.C. §1988 only when the plaintiff's action is meritless in the sense that it is groundless or without foundation, *Christiansburg Garment Co. V. EEOC*, 434 U.S. 412, 421 (1978), frivolous or

23

unreasonable. *Houston v. Norton*, 215 F.3d 1172, 1174 (10th Cir. 2000).      While Plaintiffs did not prevail on their constitutional claims, their claims were not  groundless, frivolous or unreasonable. Although Defendant Medrano's conduct did not rise to the level of a constitutional violation, the manner in which he arrested Mrs. Lee in her home and in front of her daughter may not have represented the most prudent course of action.   The boundaries between imprudent and unconstitutional conduct are not often clearly defined.  Under the circumstances of this case, the Court cannot conclude that Plaintiffs' claims were groundless or without foundation.  Therefore, Defendant's request for attorneys fees pursuant to §1988 is denied.

## CONCLUSION

For the aforementioned reasons, the Court finds that Defendant's Motion for Summary Judgment, filed July 14, 2008 [**Doc. No.  28**], is well-taken in part and will be **granted** in part.

**WHEREFORE, IT IS ORDERED** that Counts I and II  of the Amended Complaint are **DISMISSED** with prejudice;

**IT IS FURTHER ORDERED** that Counts III, IV, and V of the Amended Complaint alleging state law claims are **DISMISSED** without prejudice;

**IT IS FURTHER ORDERED** that Defendant's request for attorneys fees and costs pursuant to §1988 is **DENIED**.

Dated this 31st day of March, 2009.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE


Attorney for Plaintiffs: Gary Mitchell

Attorneys for Defendant: William D. Slease, Jonlyn M. Martinez

24